## MILTON THOMAS GREEN, ETC. *v.*
## STATE OF MARYLAND

[No. 60, September Term, 1977.]

*Decided December 6, 1977.*

484

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*William J. Chen, Jr., Assigned Public Defender,* for appellant.

*Arrie· W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Milton Thomas Green, also known as Angelo Michael Daniels, was found guilty by a jury in the Circuit Court for Montgomery County of robbery with a deadly weapon, the use of a handgun in the commission of a felony, and the unlawful transportation of a handgun. He was sentenced to a total of fifteen years. On direct appeal the Court of Special Appeals affirmed the judgments. *Green v. State,* 35 Md. App. 510, 371 A. 2d 1112 (1977). We granted Green's petition for a writ of certiorari, limiting our review solely to the question of whether he was denied a fair trial because the State was permitted to obtain an in-court identification in contravention of law.

## I

The victim of the robbery was Commander Rene Alfredo Molina, a member of the Ecuadorian Navy on duty in Washington, D.C. Although Molina's testimony at trial was elicited through a Spanish-English interpreter, it clearly established the corpus delicti of each of the crimes. About 11:15 p.m. on 16 November 1975, Molina dropped his wife and three other persons off at his apartment in the Wheaton area of Montgomery County upon their return from the Dulles International Airport. He drove to the parking area of his apartment complex to park his car for the night. He was followed by a Datsun sportscar, occupied by two black males. While sitting in his car on the parking lot, he was robbed by the passenger in the sportscar, who stole between twenty and forty dollars from him at the point of a handgun. The driver of the sportscar took the keys to Molina's car from the ignition switch and ordered him to get out of the car and walk toward his apartment. The felons drove away in their own car.

As the prosecutor pointed out in his opening statement to the jury, the real issue in the case was the criminal agency of Green. During the presentation of the State's case, in the presence of the jury, over timely objection, and under circumstances most unusual, Molina twice identified Green as one of the robbers. A viewing of photographs by Molina at the instance of the police immediately after the robbery had not resulted in an identification. On the day of the trial, shortly before it began, Molina saw Green in the courthouse, and, upon that confrontation, said he was then able to identify Green. Thus, there were an unsuccessful pretrial attempt to have Molina identify Green through photograph viewing procedures, an extrajudicial identification of Green by Molina, and two judicial identifications of Green by Molina. There was never a hearing to determine the admissibility of the judicial identifications. The issue is the propriety of their admission in evidence.

We glean the circumstances relating to the identifications of Green from the proceedings at the trial. About an hour and a half after the robbery, Molina went to the police station and viewed some 200 to 300 photographs. He made no

identification. The record does not disclose whether a photograph of Green was among those Molina viewed. Up to the day of trial Molina had not identified the driver of the sportscar who had participated in the robbery. On the day of the trial, but before it commenced, Molina saw Green in the courthouse and recognized him as the driver. Molina went promptly to the office of the State's Attorney and told the prosecutor that he was now able to identify Green as the driver. At some time thereafter, the prosecutor informed defense counsel of this development.

At the trial, after evidence had been adduced to establish the corpus delicti, the prosecutor asked Molina if he had viewed photographs at the police station. Defense counsel asked for a bench conference at which he requested that the jury be excluded as it appeared that the State was about to introduce identification evidence. The State admitted that it was going to seek an in-court identification. The court said it understood that Molina had been unable to make an identification from photographs. This was verified by the prosecutor, but he said objection was premature. It was his position that the burden was on the defense "to show somehow or another the failure to make an identification out of court tainted the in-court [identification] . . . to make it illegal." The court thought that Molina could "testify that he was shown these photo arrays and that he could not make an identification. That is not objectionable." Defense counsel made clear that "at the point [the State] wants to ask whether or not [Molina] can identify [Green], I would like a hearing out of the presence of the jury on whether or not that is a tainted identification . . . ." The court replied: "All right. We may have to do that. At this point we are not at that point." The trial proceeded before the jury, and shortly thereafter Molina testified about viewing photographs at the police station. It was elicited that he had not made an identification. The prosecutor then asked: "Do you see in Court now the person who was the driver of the Datsun?" Defense counsel immediately objected, but the court directed the interpreter to tell Molina that he could answer yes or no. Molina answered: "Yes," whereupon there was another bench

conference. Defense counsel requested a suppression hearing out of the presence of the jury. There ensued a discussion in which, as the Court of Special Appeals aptly put it, "two or three cognate issues blurred together and ... the common attention of [defense] counsel, the ... prosecutor and the trial judge never focused on the same question. The exchanges among all three parties were not sharply responsive and there appears to have been a communications gap as to precisely what the material issue was." *Green,* 35 Md. App. at 514. Although not definitively articulated, it appears manifest that defense counsel's demand for a suppression hearing out of the presence of the jury was not predicated upon any suggestion of illegality *per se* in the photographic viewing procedures but upon the fact that, as the prosecutor admitted, until Molina saw Green in the courtroom just before the commencement of the trial, he had been unable to make an identification. It was the circumstances under which Molina saw Green in the courtroom, defense counsel argued, which suggested that any in-court identification might be tainted. It cannot be ascertained from the record before us what the situation was when Molina first saw Green. The prosecutor suggested that it was when Green was brought into the courthouse. But the circumstances surrounding that entry are not shown. Whether he was brought in by a police officer or a guard or by his attorney is not disclosed. Who was then present is not known. Defense counsel now suggests that Green was in the courtroom when Molina saw him. He argues: "The victim was unable to make any identification of his assailants until the morning of trial when, prior to trial, the victim observed [Green] in the courtroom. The assailants were black men, [Green] is a black man, and [Green] was the only black man in the courtroom." *Ipso facto,* he urges, there was an impermissibly suggestive one-on-one confrontation. Defense counsel sought a hearing out of the presence of the jury to obtain a ruling by the court as to the admissibility of an in-court identification. The prosecutor, who had been resisting a suppression hearing on the ground that no extrajudicial identification had been made as a result of the photographic viewing procedures on the day of the robbery,

grasped the point. He told the court: "[Defense counsel] has now cast the die. He has given a specific proffer that this in-court identification is tainted by a pre-trial [confrontation].[1] He is no longer talking about solely what happened back in November [at the viewing of the photographs]. He is now saying what happened today when the victim saw the defendant being brought into the Courthouse taints the in-court identification. Now, I believe he has a right to that hearing in light of the proffer. That is my opinion." The court said: "We will give you a hearing." The jury was sent to the jury room so a hearing could be held out of its presence.

After court convened following a short recess, but before the jury returned, the prosecutor said: "We can truncate the proceedings at this point. [Defense counsel] is going to make a motion, as I understand it, to suppress the in-court identification by this witness [Molina]. I will not ask, in light of that, this witness to make an in-court identification." The court opined that this satisfied the problem.

The jury was brought back and Molina returned to the witness stand. The prosecutor asked:

> "Commander, with reference to what you told the jury that happened ... back in November of 1975, do you see anybody in court that had anything to do with this holdup?"

Defense counsel objected and the witness answered, "Yes," before the court ruled. This, of course, prompted another bench conference. Defense counsel moved for a mistrial because the prosecutor, by asking the very question which he had expressly declared he would not ask, had obviated a suppression hearing after conceding that Green was entitled to it. The prosecutor noted that the question now challenged was "the same question as before." He defended his actions on the premise that there would be no in-court identification until Molina specifically pointed out Green as one of the robbers. It was his idea that Molina's declaration that he saw someone in the courtroom who participated in the holdup

1. The word in the transcript is "misidentification." We think it obvious that "confrontation" was meant as there was no evidence of a pretrial misidentification.

would be followed by the request to designate that person. At that point, defense counsel could object, the objection would be sustained, and the matter not be pursued further. Defense counsel did not see it that way. He argued that "the ink was in the milk," and he was unable to see how it could be purified. It seemed that the court shared that view:

> "[The witness has] just answered the question yes. If you look around the courtroom, there is only one person out there in this courtroom that could possibly be involved in this ... thing. That is the defendant.

* * *

> "What he has now answered is that he can see somebody, has seen somebody in this courtroom. The way it was asked this time and the affirmative answer can only point to the defendant."

Defense counsel vigorously pursued his objection:

> "What can I possibly do now? He has got the question in. He has denied me my suppression hearing. I don't see what else Your Honor can do [but grant a mistrial]."

The jury was again sent back to the jury room. The reporter read the record relating to the question as first asked. The court leaned toward the State's position: "He has not identified [Green] as being the one." Defense counsel thought the court was "stretching things there. There isn't any question but what there has been an identification. I have been denied a suppression hearing I am entitled to. That is the point." The court vacillated: "I have some question as to whether the jury based on the answers can't figure out who he was talking about," but "[t]he identification has not been made to the extent he has looked at the defendant and said 'That is him.'" On the other hand, the court continued: "He didn't say, when you asked him the question, look around the courtroom, do you see anybody that participated in this robbery, he didn't say no. He answered yes. Having answered

that, if there were half a dozen other young black males in the courtroom that we could say might have been involved in this, it might have been a different story. We don't have a half a dozen blacks in the courtroom. We don't have anybody but the defendant." It was then determined, apparently to the satisfaction of all concerned, that Green was the only black in the courtroom both times the question was asked. Nevertheless, the judge denied the motion for a mistrial, cautioning the prosecutor that "there will be no more questions about this identification . . . ." He left it up to defense counsel "to figure out how to handle" the identification "left hanging," suggesting only that "[t]here has been no positive identification of the defendant."

## II

We are in complete agreement with two holdings of the Court of Special Appeals which the State readily concedes are correct: (1) before the admission of any evidence identifying Green as the criminal agent, he was entitled to the requested suppression hearing out of the jury's presence, and (2) there were in-court (judicial) identifications of Green placed before the jury without the required hearing. The holding of a suppression hearing, the course of its conduct, and the factors relevant to the admissibility *vel non* of challenged identification evidence, are dictated by rules now firmly established. *See United States v. Wade,* 388 U. S. 218, 87 S. Ct. 1926 (1967); *Gilbert v. California,* 388 U. S. 263, 87 S. Ct. 1951 (1967); *Stovall v. Denno,* 388 U. S. 293, 87 S. Ct. 1967 (1967); *Foster & Forster v. State,* 272 Md. 273, 323 A. 2d 419, *cert. denied,* 419 U. S. 1036 (1974); *Smith and Samuels v. State,* 6 Md. App. 59, 250 A. 2d 285, *cert. denied,* 254 Md. 720, 255 Md. 743 (1969), *cert. denied,* 397 U. S. 1057 (1970). *See also, Manson v. Brathwaite,* 432 U. S. 98, 97 S. Ct. 2243 (1977); *Neil v. Biggers,* 409 U. S. 188, 93 S. Ct. 375 (1972); *Kirby v. Illinois,* 406 U. S. 682, 92 S. Ct. 1877 (1972). As to confrontations at the instance of the police between a suspect or accused and a potential identifying witness, *see, e.g., Foster & Forster,* 272 Md. at 288-304; *Davis v. State,* 13 Md. App. 394, 399-403, 283 A. 2d 432 (1971), *cert. denied,* 264 Md. 746 (1972); *Billinger v.*

*State,* 9 Md. App. 628, 636, 267 A. 2d 275, *cert. denied,* 259 Md. 729 (1970); *compare, Mills v. State,* 19 Md. App. 614, 313 A. 2d 560 (1974). As to such confrontations not at the instance of the police, *see, e.g., Austin v. State,* 12 Md. App. 629, 634-636, 280 A. 2d 17, *cert. denied,* 263 Md. 709 (1971); *Britton v. State,* 10 Md. App. 70, 73-74, 267 A. 2d 747, *cert. denied,* 259 Md. 730 (1970); *Simon v. State,* 7 Md. App. 446, 450-451, 256 A. 2d 348 (1969), *cert. denied,* 256 Md. 748 (1970); *Nance v. State,* 7 Md. App. 433, 436-441, 256 A. 2d 377 (1969); *cert. denied,* 256 Md. 747, *cert. denied,* 398 U. S. 954 (1970); *Wethington v. State,* 7 Md. App. 79, 83, 253 A. 2d 523 (1969); *Coit v. State,* 7 Md. App. 70, 73-74, 253 A. 2d 526, *cert. denied,* 256 Md. 744 (1969); *Smith v. State,* 6 Md. App. 23, 28-30, 249 A. 2d 732, *cert. denied,* 254 Md. 720 (1969). *Cf. Palmer v. State,* 5 Md. App. 691, 249 A. 2d 482 (1969) (pretrial confrontation held illegal).

The Court of Special Appeals thought that the in-court identification was "prematurely made before the opportunity for a timely requested 'taint' hearing" was satisfied. *Green,* 35 Md. App. at 531. It properly found that "[t]he exclusionary hearing ... was mandated to determine what, if any, effect the pretrial circumstances may have had upon the in-court identification." *Id.* at 523.

In holding that an in-court identification was made, the Court of Special Appeals gave the premises for its conclusion:

"Commander Molina's narrative definitely establishes that both of his assailants were Negro males. The record further establishes unequivocally that at this critical juncture in the trial, the appellant was the only Negro male in the courtroom. When, therefore, the robbery victim responded in the affirmative that *he did see* one of his assailants (the one who had been the driver of the Datsun sportscar) in the courtroom, this was an effective identification of the appellant notwithstanding the fact that all systems ground to an abrupt halt before the appellant was literally pointed to or identified by name. That the intellectual thought process involved

two steps rather than one does not diminish the end product that the appellant was effectively singled out. The process of elimination is within a jury's intellectual competence." *Id.* at 513.

The identification to which the Court of Special Appeals refers was the first that went before the jury. As has been pointed out, Molina made a second in-court identification upon inquiry of the prosecutor after the prosecutor had stated that he would not ask the witness to do so. The second was as fully a judicial identification as the first.

The Court of Special Appeals found that "no pretrial identification was made." *Id.* at 523. The State is in accord, asserting that "no pretrial identification was made in any event." We disagree. When Molina saw Green before the trial commenced, he immediately informed the prosecutor that he could now identify Green as one of the robbers, the driver of the sportscar. To all intent and purpose this confrontation effected an out of court (extrajudicial) identification of Green.

Buttressed by its conclusion that no pretrial identification had been made and offered into evidence, the Court of Special Appeals thought that there was an "after-the-fact examination" which revealed either that there was no primary illegality in the pretrial circumstances or that the in-court identification had an independent source. It believed that nothing was brought out which was harmful to Green's cause, and, thus, "all is well." *Id.* at 531-532. Again, the State is in accord. It reasons that the Court of Special Appeals properly designated any error as non-prejudicial. It asserts: "[T]he record shows that all circumstances surrounding pretrial confrontations were in fact uncovered at the trial, notwithstanding that the timing may have been improper and the jury should have been excused." Because "absolutely nothing was elicited to demonstrate that anything impermissibly suggestive had been done by the police or anyone else to effectuate a pretrial identification," which, in any event, had not been made, "there was no source for any possible taint of the judicial identification." We do not subscribe to these views of the Court of Special Appeals and the State.

At the time of the first in-court identification it seems that neither the judge nor the prosecutor nor defense counsel appreciated that a judicial identification had been made. As the Court of Special Appeals observed: "[E]veryone treated the identification as if it had not yet occurred." *Id.* at 517. Whether allowing this judicial identification to go before the jury could have been cured by holding the suppression hearing as first contemplated is academic because the hearing was never held. It was aborted by the action of the prosecutor in again placing before the jury a judicial identification of Green by Molina. At the time of the second in-court identification, the prosecutor did precisely what he assured the judge and defense counsel he would not do — elicit from Molina an in-court identification before the jury without the suppression hearing to which he had conceded Green was entitled. It was of no moment that the prosecutor may not have intentionally misled the court and defense counsel. Even though he sincerely believed that he was not violating his agreement and was genuinely mistaken in his view that an identification would not be made until the witness was asked to point and did point to the person to be identified, the challenged identification was, nevertheless, twice before the jury, the second identification, at the least, emphasizing the first identification. Both the judge and defense counsel were surprised and chagrined at the action of the prosecutor. Defense counsel recognized the situation as it truly was and was steadfast in his claim of error. The judge, however, was ultimately persuaded, although not without pause, that a judicial identification had not occurred.

We cannot be satisfied from the record before us that there was, as the Court of Special Appeals believed, an "after-the-fact examination" which was sufficient to show that there was no primary illegality in the pretrial circumstances or that, if they were illegal, the in-court identification had an independent source. The record here is simply not adequate for us to do so. We are unable to make our required independent constitutional examination and appraisal of all the facts, circumstances and environment in connection with the extrajudicial identification in order to

determine whether there was a primary illegality which so tainted the judicial identification that its admission rendered the trial unfair in violation of due process of law. *Foster & Forster v. State,* 272 Md. at 304. The ascertainment of such facts, circumstances and environment is properly the object of a suppression hearing, and would enable the trial court, in the first instance, and an appellate court, on appeal, in the discharge of its responsibility, to reach a considered determination of primary illegality *vel non* of the pretrial confrontation. Adherence to, rather than departure from, the established substantive and procedural rules to be followed upon due challenge to evidence of the criminal agency of a defendant is called for.

Green urges only that the circumstances here required that he be afforded the opportunity through a suppression hearing to establish that the judicial identification of him was tainted. He contends that the opportunity was improperly denied him. We agree. We conclude that in the unusual, perhaps unique, circumstances by which evidence of Green's criminal agency was placed before the jury,[2] he was denied a fair trial. Prosecutorial misconduct, even though not calculated, combined with the failure of the trial court to conduct a suppression hearing, violated due process of law. *See Wilhelm v. State,* 272 Md. 404, 429-431, 326 A. 2d 707 (1974). Therefore,

---

2. We note that after the State concluded its case, Green called Molina as his witness. During direct examination of Molina by defense counsel, Green was again identified as the driver of the Datsun. By this time, of course, the "ink was in the milk," and it is apparent from further examination of Molina that defense counsel was attempting to salvage what he could by showing that the driver remained in the car when the passenger first accosted the victim, and that the driver never displayed a weapon. On cross-examination the court precluded inquiry by the prosecutor as to why Molina could now identify Green but did not "pick [Green] out from the photographs on the night of the crime," and also sustained objection to the prosecutor's question: "Why did you come down to my office and tell me that [Green] was the driver and not the gunman?" The State makes no point of the recall of Molina by the defense except to observe that he "was examined regarding the basis for his judicial identification." In all the circumstances existent, we do not deem the identification by Molina on recall by Green to be a waiver of objection to the admission of the judicial identification during the State's case nor to render the error in first admitting the identification harmless. *See* Dorsey v. State, 276 Md. 638, 350 A. 2d 665 (1976).

we reverse the judgment of the Court of Special Appeals and direct that Green be awarded a new trial.

> *Judgment of the Court of Special Appeals reversed with direction to remand the case for a new trial; costs to be paid by Montgomery County.*